Good morning, judges. Good morning, counsel. The first case this morning is 19-4130, GeoMetWatch v. Behunin. Counsel, if you would, please unmute yourselves and prepare to argue. For some reason, I am not getting counsel on the line. Here, just give me a minute. Nope. What have I done here? Tech folks trying to get the gallery view. Nope. Please be patient. I keep seeing staff, but I see counsel now. All right, counsel, we are ready to hear you. And you're ready to proceed, please. Yes, your honor. Thank you. May it please the court. My name is James Magleby. I represent the plaintiff and appellant, GeoMetWatch Corporation. And I'm going to attempt to reserve three minutes of my time so that I can answer the court's questions at the end. Since the time is short, I would like to proceed directly to scenario 3A of the damages scenarios considered by the district court. As that scenario is, to put it colloquially, kryptonite to the analysis advanced by the defendants in the district court. I'll then briefly touch on 3B. I will lump scenarios 1 and 2 together, touch on lost business value, and talk about immunity issues. But moving directly to scenario 3A, as the court is aware, there are four damages scenarios at issue. Confusingly named scenarios 1, 2, 3A and 3B. Each scenario or the issues before the court relate to three components of the GeoMetWatch project. The first component being the financing. The second component being the builder of the instrument or the satellite that goes into space. And the third component being basically the rocket, the operator, the entity that puts this into space. And what the defendants have argued is that because AsiaSat would not do a deal with GeoMetWatch, one of those three components was missing. The district court's damages order, however, addressed only three out of the four damages scenarios. And the discussion of AsiaSat missing was all or nearly all of the trial court's order. So it did not acknowledge that GeoMetWatch had in fact in place a plan to pivot, if you will, and we call it the pivot plan in the briefs, to rebuilding the legs of the stool. If it's a three-legged stool and one of the legs goes missing, GeoMetWatch did not sit on its hands. It went out and it attempted to remedy the problem, which, by the way, makes this case markedly different than the Mahmoud case, upon which the defendants rely and which the district court spent so much of its time. Because of this pivot and because AsiaSat and indeed the builder of the instrument, Advanced Weather, were being replaced, Scenario 3A is essentially kryptonite to the defendants' arguments. It does not rely upon either AsiaSat or AWSF. And again, that pivot is reflected. It's not hypothetical. There was testimony in the record, but there was also a written document dated February 12, 2014, at Appendix 5059, which discussed making this pivot. Well, is this with respect to ITT's agreeing to construct a sensor? That is part of the pivot, Your Honor, yes. GeoMetWatch was replacing the builder. They denied it, did they not? What happened was they… Didn't they deny that they would have provided a guarantee for the loan? That is true. They said that they would not guarantee the loan at the time that the project went away. However, ITT was only one portion of the potential financing that was out there. And the crux of Scenario 3A is really that what GeoMetWatch could have done, Your Honor, is gone to the venture capital market. As you know, there was a deal in place with AsiaSat where AsiaSat was going to put in tens of millions of dollars because of the potential upside from this project. And we had very well-qualified experts, including Matt O'Connell, who had taken a similar company to a billion-dollar exit, who said, look, the venture capital markets were robust at the time, and GeoMetWatch project had all of these milestones. Somewhere in the record, there's a hearing handout with 15 different milestones that GeoMetWatch had achieved, including that Ex-Im Bank had vetted and tested the revenue models, found them sufficient, and that there was a technical study commissioned by Ex-Im Bank, which said the technology will work. What Mr. O'Connell and Mr. Piazza said is, with that strength, they could have gone to the market and obtained venture capital financing. Where in the record are the specifics of obtaining this additional equity set forth? So that would be in two places, Your Honor. It would be in Matthew O'Connell's expert report, and it would be in Mark Piazza's expert report. I'm sorry, say that again? Yes, Matt O'Connell's expert report and Mark Piazza, P-I-E-G-Z-A. And they go into details about the state of the capital markets and the state of the project, essentially. And these are not just any experts. These are not venture capital experts, per se, on their own. They are venture capital in rockets and space. So they're as specific an expert as you can get. They are eminently qualified. But those experts, Mr. Magleby, do not opine on the question of causation. And they indicate that they are not competent to opine on the question of causation. And that is the crux of why the district court denied relief. I mean, so all of this discussion about could have, number one, suggests speculative action. But beyond that, so what? I mean, so what if you could have gotten relief? You still have to prove that the defendants caused your harm. That is correct, and you are correct about the testimony from the experts. So let me start with your point about what the experts said. It is not unusual for damages or other experts to say, I am not going to issue a legal opinion on causation, per se. That is for the jury. But what they do testify about is facts, and they give opinions that can be considered by the jury in determining that ultimate issue of causation. So what they have said with regard to what I call financing causation, and I think there's two ways you can look at causation here. One is the financing causation, which is the crux of the defendant's argument. You never could have gotten this project funded. What they say is, actually, you could have gotten this project funded. And so that evidence would come into court in front of the jury and be considered by the jury in determining whether or not it was the defendant's theft of the trade secrets that caused the loss. So I agree with that. And then in terms of what is the nexus, though? I mean, one can say that I'm damaged because a deal doesn't take place. I could have gotten financing to make this deal take place. The deal didn't take place. Ergo, I'm damaged. That doesn't establish that the reason the deal did not take place was because of wrongful conduct by the defendants. And that's the crux of what we're getting at here. And I don't see it. So help me, where is that evidence of wrongful conduct? And if you're talking about the November email, your client was on life support before the November email. So what do you have? Sure, Your Honor. So that goes up to what I call the second causation here. I call it the destruction causation. Is there sufficient evidence from which the jury could conclude that the defendants are the ones that killed GeoMetWatch, that GeoMetWatch died because of the defendant's actions? So in terms of destruction causation, there is more than enough evidence there as well. So at one point, and it's in the record, it's not the better offer email, but there's an email where there is a suggestion between AsiaSat and Allen Hall that they're going to run GeoMetWatch out of money to limit their financial obligations. And they successfully do that. They get $250,000 from GeoMetWatch in the fall of 2013. Then what happens is they mislead GeoMetWatch in January. GeoMetWatch's lawyer, who's also representing Hall, lies to GeoMetWatch and says Hall is not pursuing this project. And then in April, they suddenly announce that they have a competing project. And you need look no further than the defendant's own admissions and actions, Your Honor, because Allen Hall and the other defendants are desperate to stop GeoMetWatch. And so you have the nail in the coffin email. You have the GMW burns in hell email. You have the we need to devastate the competition email. Because Allen Hall, while he's not moral or ethical, he does understand investors and lending and venture capital. And he knows that if he does not finish off GeoMetWatch, they're going to go to the market and be able to raise money. What Mr. Hall believes or doesn't believe, it seems to me, is irrelevant. And it also let's assume arguendo that Mr. Hall is a bad guy. And these emails show him to be a bad guy. That doesn't mean that he is responsible for what's happening here, because the reality is Asia Stat had conditions preceding. It said, if you do these things, I'll do a deal with you. Your client didn't do the things. So, I mean, you know, Mr. Hall didn't have anything to do with that. Your client didn't do the things. Well, I didn't, you know, didn't pay the money that he was supposed to. They were supposed to pay. So how did Mr. Hall do anything about that? So what Mr. O'Connell says, and again, he's an expert in financing and raising venture capital for rockets. He's, you know, for rockets, for space, whatever. He says, look, in the spring of 2014, GeoMetWatch is well poised to get venture capital and they're going to the markets. That evidence is in the record. But what happens is suddenly there's an announcement from Tempest that they are going to do this deal and they're going to pursue this project with GeoMetWatch's old partner. And that is a stake in the heart, combined with the filing of the lawsuit, which says they don't own the technology. David Crane talks about how these things made it such that they could not raise more money from their existing or other investors so that they don't have to rely upon Asia Stat. With regard to your last point, Judge Holmes, about doing the deal with Asia Stat, I think there's abundance of evidence in the record, both circumstantial and direct, that had Alan Hall not made what we call the better offer, which was offering. That was in November 2013. I went back and looked at the timeline just this morning. Your client was on life support relative to the Asia Stat deal before November 2013. They had already extended the conditions proceeding twice, had they not? They had, in fact. And so at any one of those points, they could have walked away even before they knew Mr. Hall existed. So how in the world is he? Is he the condition proceeding to the nail in the coffin? He can use whatever inflammatory language he wants. That doesn't mean he did it. So, Your Honor, what you're talking about here, it's an issue of fact that can and should be presented to the jury. It's similar to Extech. Was there a pretext? Was this a pretext? And prior to Mr. Hall coming along, Asia Stat did not cancel the loan. They left the loan sitting there. There were discussions about it. They sent emails that said were enthusiastic about getting the convertible note done, and they gave two extensions. And they stood to make hundreds of millions of dollars from this project. And I think there's enough evidence there showing that there was value and a likelihood of success. I would say that it's analogous to the Braun versus Medtronic case, which looked at what the defendants did when they paid a bunch of money for the technology. Their own internal valuation said it was worth a lot of money. May I ask just a quick question because you're running out of time? Yes, Your Honor. Was the nondisclosure confidentiality agreement broad enough to cover the financial, any knowledge that they obtained regarding the financial condition of your company? Absolutely, it was. And the first line of the Better Offer email reflects Alan Hall using that information and disclosing it to both Asia Stat and Advanced Weather. GeoMetWatch is running out of money. What he essentially says is they're vulnerable and we can take advantage of them. Next question I have is, but for the information that they obtained subsequent to their signature of that letter, would they have been in a position to know that you were in a not unlikely and not unusual situation for startups, a precarious condition? I think that's a classic fact issue. We could argue about that, but that should go to the jury. But what GeoMetWatch was doing was it was looking at a Series B financing. It was going to go and raise money. This project had gone on for years. Thank you. You can reserve the rest of your time. I will. Thank you, Your Honor. Good morning, Your Honor. This is David Tufts. May it please the Court, I represent the defendants, Alan Hall, Tempest, and Island Park Group of Companies. I'll note as I begin my argument that there are several groups of defendants. Mr. Joshua Davidson represents the Utah State University defendants, Robert Behunin and Curtis Roberts, and Ms. Beth Ranshaw represents the AWSF defendants, including Mr. Scott Jensen. We have divided the time amongst us, and so I will take the first few minutes, and I'd like to speak to the issue of causation. Well, I'd like you to speak to my last question first. But for the information that was obtained subsequent to the signature of the confidentiality nondisclosure agreement, would your clients or any of the associated clients have known about the relatively precarious financial condition of the appellant? So the answer is yes, Your Honor. In the testimony of Bill Wade, who is the chief executive officer of AsiaSat, the key third party in this case, they were monitoring and in conversations with GeoMetWatch to understand what GeoMetWatch's capabilities were. Furthermore, Your Honor, it's very apparent in the record, supported by ample record sites, to indicate that AsiaSat understood that GeoMetWatch's precarious financial situation was the main problem, if I could phrase it as such, with this venture. Counsel, isn't it always true for startups? If startups were wealthy at the get-go, they wouldn't be venture capitalists. There wouldn't be crows around trying to pick on the dead corpus. The fact is that they would be healthy from the get-go. But that is not the nature of startups. Startups are people with a dream and not much money. And putting the dream and the money together is what venture capitalism is all about. As I review the record, it seems to me adequate evidence to present a material dispute about whether there was a lively enough corporation here to go to the venture capital market to try to seek financing to meet the conditions of this contract. Why am I wrong? What's wrong about that observation? Keep in mind, Your Honor, that the posture, as you've outlined, this new company that has no resources, that has no business, has a business model to launch a satellite, in fact, a constellation of satellites. And they'll start with one by putting it on the AsiaSat. It's going to cost around $140 million to $150 million to build that sensor. And until your company stuck its nose in their business, they were seeking to do so first with Asia directly. And they had not yet gone to the venture capital market. I guess I'm not as sympathetic to your condition as my colleagues appear to be. It just seems to me that it's almost interference with the business relations of this company that you would not have known about the condition, notwithstanding your argument about it, because you didn't know about the bank information. A lot of the financial information you folks obtained after you looked at the data provided to you pursuant to that agreement. So I'll respond with two points, Your Honor. One thing to bear in mind, Your Honor, is that this is a motion that challenges the element of causation. We purposely did not present the element of liability as a basis because we wanted to test the element of causation, which was found to be lacking. And so on the issue of causation, Your Honor, the record is clear that GeoMetWatch and AsiaSat entered into a cooperation agreement many, many months prior to any introduction to the Hall defendants. And pursuant to that cooperation agreement, AsiaSat was very clear in putting the burden on GeoMetWatch to provide the financial wherewithal to make this project happen. And it's a very expensive project. You don't just get this kind of money, you know, it doesn't come out of thin air. And the record is clear that GeoMetWatch undertook that burden and was not able to satisfy the burden. GeoMetWatch simply wasn't able to deliver the necessary financial backstop, we call it, or guarantees, right, the financial wherewithal to make it possible that AsiaSat could take out a loan from the Ex-Im Bank. Now, if I give you that, what's to keep them, assuming that you're correct about that, what is to keep them from pursuing another opportunity with someone else through alternative financing? Sure. So, Your Honor, keep in mind the case as it was presented to the district court by GeoMetWatch. GeoMetWatch presented its damage theories in its initial disclosures. There was a supplemental disclosure, and that's in the record, the last disclosure, where GeoMetWatch walked through the damage theories that it was presenting in terms of lost profits. These scenarios that GeoMetWatch's counsel identified as not being clearly laid out are four different scenarios that depend upon some connection, that depends upon others to provide services. There has to be an operator, there has to be a launch partner, there has to be a lender. GeoMetWatch has to provide the backstop. And they walk through the scenarios, starting with the most likely scenario, according to them, which is pursuant to all of the contracts that are already in place. And the record is very clear that the third parties involved in those contracts, including AsiaSat and the Ex-Im Bank, could not proceed because GeoMetWatch was unable to provide the financial backstop, the necessary contracts or the necessary commitments to make this function. And each scenario walks through one level of more speculation. Scenario one has the actual… Well, it seems to me that you're speculating just as much as they are. What is to keep them, assuming they couldn't obtain the financing, to turn around and try to sell their project as an unfinished project to anybody who came along, including your clients? In other words, get consideration for what you did is intermeddle in their business, knock out the props, any hope they could of proceeding with their company. It seems to me, and this is all a presumption, of course, I maintain an open mind. But it seems to me that the record demonstrates a potential for you to be seen as an intermeddler that propped out the financial potential of this company and then picked it up for nothing. Where, in fact, they potentially could have sold, even assuming it was in dire financial straits, they could have gone and tried to sell their intellectual property and their work to date to others for consideration rather than to have you pick it up for nothing. Your Honor, I'll just note that I've gone past the time that I had allocated to my co-counsel, but I will run into that time to answer your question. Your question included the statement that my client is speculating as much as GeoMetwatch is speculating. Right. Yes. This is really the concern. It's GeoMetwatch's burden to present evidence to show that they lost an opportunity caused by something that was done by my clients. And the evidence of all of the players involved, AsiaSat, Ex-Im Bank, ITT, have all testified that they were not influenced by anything that the Hall parties or any of the other defendants did or didn't do. And so, GeoMetwatch has moved through the damage scenarios that they presented to the district court and into areas they didn't even present below to suggest that there's some kind of lost business valuation. That wasn't presented below, but it's being argued here. And the district court very carefully examined all the evidence and found there's no evidence of a causal connection with regard to the people that were involved. There's no evidence of a causal connection with regard to some of these unidentified players. And then moving further out, the district court found that it's pure speculation to say that GeoMetwatch would have done something out of this scenario. Because you have to remember, GeoMetwatch had to raise the money to finance the venture, and it failed to do that. And it failed to do that on its own accord because that's a hard thing to do. It failed to do that up to the point where you got involved, at which point a difficult task became an impossible task. Well, there's simply no evidence. A jury could well take their version of the case and come to a different conclusion. That's entirely my point. I'm not saying that my take on this is correct. I'm just saying that it's an alternative take that a jury in a case properly presented to a jury, competently presented to a jury, might come to the opposite conclusion. So, again, I'm over time, but I want to address that question, and I will. I would refer Your Honor and the court to the decisions in Pioneer Center, which is 10th Circuit, and to the opinion in Mahmoud, which is the state of Utah law. Those cases both hold that even if you have a situation where what the plaintiff is presenting is equally possible, it is insufficient to satisfy the plaintiff's burden without some evidentiary foundation. Pioneer Centers looked at a situation where you had a third party involved, the Land Rover dealership, like we have in this case with AsiaSat, Ex-Im Bank, and ITT, where the third party said we weren't influenced. They have spoken as to why they did what they did. And in that case, the court held correctly, applying this standard of causation, that the plaintiff has failed to meet its burden. To go to the jury under the theory, as you framed it in your question, would be to invite the jury to speculate without evidence that the Hall defendants and the other parties caused GeoMetWatch to lose its business, when, in fact, the record is clear as to why GeoMetWatch was unable to proceed. Well, you say without evidence, but we have an 18,000-page appendix to this case. I mean, nothing that I could review in an afternoon walk through the park, I'll assure you. And it just seems to me that it requires for us to do a record study to determine whether the argument that the appellants present is meritorious. Well, sheer volume of paper is never a basis to grant a summary or deny a summary judgment motion. If the court, and I know you will, go through the citations found in the Allen Hall Tempest brief, in our arguments, we carefully cite to the record where each of these elements, each of these factual bases is established. You'll see that the conditions precedent were mandated long before Hall ever became involved, that GeoMetWatch failed to satisfy the conditions precedent on its own accord. In fact, it's undisputed that GeoMetWatch refused to provide the convertible note. They just simply refused it. They offered something else, and it was unsatisfactory. They acknowledged, Mr. Crane acknowledges, that it was unsatisfactory to AsiaSat. And in addition, the problems with the financing, the financial backstop. And so, in light of the fact that there are these affirmative evidence from third parties contradicting, establishing that there's no causal connection, then the burden shifts to GeoMetWatch to identify competent evidence, which GeoMetWatch has failed to do. Nothing that GeoMetWatch has cited is competent evidence showing that the Hall defendants, or any defendant, caused GeoMetWatch to lose this opportunity. I'd like to cede the rest of my time to my co-counsel, unless there are other questions. Oh, man. I haven't given my colleagues much opportunity. I apologize to both of you for that. Good morning, Your Honors. I'm Joshua Gates. I think Judge Kelly had a question. No, no. I just noted there was less than a minute left. Good morning, Your Honors. I'm Joshua Davidson on behalf of Utah State University Research Foundation. Robert Buhonen and Curtis Roberts. The district court correctly applied the undisputed facts to the state law test announced by the Utah Supreme Court and correctly determined that you serve as a governmental empty. One second, counsel. With my colleagues' permission, why don't we extend the argument time with three minutes to both sides. Is that okay? That's fine. If you'll show three and a half minutes remaining time. Thank you. Thank you, Your Honor. So, the district court applied the undisputed facts to the state law test and correctly determined that you serve as a governmental entity entitled to the protections of the Immunity Act. Under the test, the inquiry is twofold. Whether the entity is a branch of the state that performs state functions, and second, whether the branch has functions of the same general kind, character, and nature of the 12 enumerated terms that preceded the catch-all phrase, other instrumentalities of the state. Here, you serve plainly satisfies both prongs of the test. The undisputed record evidence shows that you serve as a branch of USU, Utah State University, and carries out its functions. University is defined as the state in the act, and you serve as created pursuant to express statutory authorization to further Utah State University's scientific research and educational objectives. It is held by USU, completely controlled by USU, is subjected to additional oversight by the State Board of Regents, a separate state entity. It is financially accountable to USU, subjected to its annual audit, and it's reported as a component of USU in its financial state. Well, what's your response to the contention that it really is, you serve as a for-profit corporation, and it doesn't really have an educational mission? Its goal is to make money. Well, it was specifically created to further the research and scientific objectives of research by statutory authorization. The statutory authority for it allows it to have these grant funds to contract to do it. That's done by the Utah State legislature. It's authorized that. And you serve as one of 14 UARCs, and its status as a UARC, the University Affiliated Research Center, is the reason why Utah State University is afforded millions of dollars in research opportunities that otherwise wouldn't have. So the fact that it makes money, the Utah legislature has directed how USU's revenue is to be spent, and it's to be spent paying off state bonds that were issued for Utah State University projects. So it's completely controlled by the state and created by the state to further its scientific research and educational objectives. And I'd like to turn over the rest of the time to Beth Ranshaw. Please, the court. Beth Ranshaw on behalf of Utah State University Advanced Weather Systems Foundation and Scott Jensen. We asked this court to affirm the district court's rulings on three different bases. First, governmental immunity, finding that AWSF is in fact an instrumentality of the state. Second, on causation grounds. And finally, finding in favor of AWSF on its breach of contract claim against GeoMetWatch. With regard to immunity, there's no question that AWSF is an instrumentality of the state. It was created as a wholly owned subsidiary of Utah State University. It is controlled by Utah State University and was created pursuant to the enabling statute. It carries out the state functions of scientific research and education, which is similar to the enumerated term of university, meaning the third prong. With regard to causation, I do think it's important to once again just- and say, oh, we're not private sector actors, we're state actors. You were in this for profit, weren't you? This actually- AWSF never made a profit and we were created as a 501c3 nonprofit research foundation. I understand where you were formed as. My question is, were you not involved in this sector to make money? Any money that would have been made would have gone back to Utah State University, which is a state-created foundation. Also, just to go back to your point about private enterprise, both Immunity Act and the private enterprise question are answered by the Utah State Legislature. Utah State Legislature obviously gave immunity to instrumentalities of the state, but it also specifically allowed Utah State University's foundations to enter into private contracts. And that is section- Thank you, Counsel. On this basis, we would submit on the briefs and all defendants would ask that this court affirm. Thank you. If you would add an additional minute and 17 seconds to the appellate side, please, Mr. Hiram. And I understood, perhaps- Plus the additional three minutes.  I will touch briefly upon Mr. Tuft's points about causation. I think this case is a lot closer to and a lot more like the Extech case and the Braun versus Medtronic case than it is like Pioneer and Mahmoud. In both of those cases, there was literally no evidence. In this case, there is abundant evidence, including evidence of a pretext by AsiaSat. And Mr. Tuft says, well, AsiaSat said that it wasn't going to do a deal. However, if you look at the very cases cited by the Hall Defendants on Appeal, where they talk about testimony from a third party, the parentheticals to those cases say you can only look at that in terms of giving it full credibility if it is a disinterested party. AsiaSat was a very interested party, especially after it gets the better offer email, which offers them literally tens or maybe even hundreds of millions of dollars in more money if they abandoned their business partner. And, you know, do we know what would have happened? We don't because they destroyed that opportunity in that chain of events, which I think takes us into the Braun versus Medtronic logic, where the court said Medtronic would have us require that Dr. Braun prove in detail every step of a hypothetical approval process that never occurred. But as discussed above, Utah law does not require satisfaction of such an exacting standard. They would like to say you have to basically prove a negative. Well, we have come forward with evidence that establishes two things. Number one, G.O. Metwatch could have gone to the markets and raised venture capital to save its project. And number two, the actions of the defendants killed the ability to do that. I would also ask the court to look at the Kilpatrick, Butterfield and Smith versus Fairfax decisions out of the Utah Supreme Court on causation. I think in at least two of those, they said something to the effect of from our perspective, it seems like an attenuated or slim theory. But that doesn't matter. It is something that has to go to the jury. It is not for a judge to decide. I would suggest we have more evidence than was in the Smith case where there was a loan that was in default. And the defendant argued you never could have refinanced this loan. You were going to lose them all forever because of a foreclosure. And the only argument that was made at the trial court level, I know this because I was there, was, well, they should have tried harder to refinance the loan. And the Utah Supreme Court said that's enough. We have more here. We have G.O. Metwatch actually trying to revive its project as reflected in a written document reflecting the pivot. And they go to the market and then Mr. Hall succeeds in putting the final nail in the coffin. If they could have gone to the market before Hall's email, why didn't they do that? I mean, there were two extensions on what Asiastat was going to do, and you never did give up the convertible note, which is also a point. I've got an answer to both of those. Good. Yes. The reason they didn't go to the market at that point was because Alan Hall was misleading them into believing that he was going to fund the project. At one point, he even made an offer of 150 million dollars for 23 percent of the project, which would have funded the satellite. And that's in the record. So they didn't go to the market at that point because they believed Alan Hall was working in good faith when actually what he was doing, as reflected in the ethics memo, was stringing them along and waiting for them to default. In terms of the convertible note, there is an October email where Asiastat says, we are very enthusiastic about this project and we want to move forward on the convertible note. What happened is Asiastat suddenly changed the terms to make them untenable, saying that the storm sensor had to be pledged as collateral. Asiastat knew all along that would never work under ITAR restrictions because Asiastat was based in China. The federal government, NOAA and NASA, would never let that happen. It was a pretext that they knew could not be agreed upon by GeoNetwatch that would then allow them to terminate the agreement. And that falls squarely within Extech, where the Navy sent an email that said, if you don't change the software, we won't do business with you. And the defendants made a very similar argument, saying there is no way you can prove causation because your business partner said they weren't going to do business with you. And the Extech court said the jury could infer that the Navy sent that email as a pretext. Now, the Navy was a disinterested party. They didn't stand to make more money from that different software. Here, Asiastat stood to make a lot more money. Why didn't Mr. Hall indicate that he would have funded them, the amount of money that you're talking about? There is an email in the record. I believe it was in November. He offers $150 million. November 2013? Yes, November 2013. Well, by November 2013, you had already gotten two extensions from the Asiastat deal. Well, if you had been able to get this money, and if you didn't need Mr. Hall, then why didn't you get the money? Well, we believe that Mr. Hall was acting in good faith. He then changed the terms of the deal. But you're saying that Mr. Hall said he would get the money in November 2013. And then by November 2013, you had gotten two extensions from Asiastat to give the backstop. If you could have just gone to the market and gotten the backstop, why didn't you do that? Because they believed Mr. Hall was genuine before he withdrew that $150 million offer. I thought you just told me the $150 million offer was in November of 2013. I'm sorry, what did I say? I thought you said it was November. Well, November would have been after the two extensions that you had gotten from Asiastat, not able to provide the backup. So the point being, how could you be relying on something that happened after you had already gotten two extensions? Because GeoNetwatch did not give up. It takes time to do these things. The project had been going on for years. And I see my time is up. If I could finish answering your question. Just answer Judge Holmes' question, please. Okay. Sorry, I lost my train of thought. GeoNetwatch did not give up. They were continuing to try to work with Asiastat and Alan Hall. And in fact, Asiastat continued to talk with them through March until Alan Hall told them to stop talking to GeoNetwatch and had done the other things designed to kill the business. So they were going to the market. They were in the process of doing it, but you can't do it overnight. It takes a long time. I think six to 12 months is what Mr. O'Connell said. So the timeframe is covered in the reports. And in answer to Judge Lucero's earlier question, where is this in the record? If you read the O'Connell and Piazza reports, they talk about the timing. I did not get to address the GIA issues. Thank you, Counselor. Your time has expired. Thank you. We understand the case. It's a long record to review, but we'll get a decision at some point. The case is submitted. Counselor excused.